***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies in part and affirms in part the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer at all relevant times.
3. The carrier liable on the risk is Cincinnati Insurance Company.
4. At all relevant times, defendant-employer employed three or more employees.
5. Plaintiff's average weekly wage at the time of the alleged incident, 6 June 2001, was $345.52.
 ***********
Based upon all the competent evidence of record the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was thirty-nine years old and had a high school diploma. Plaintiff spent five and one-half years in the U.S. Navy handling ground support equipment for aircraft. While in the Navy, plaintiff was trained in fire fighting, safety inspections, and crash and rescue. Plaintiff was honorably discharged from the Navy and returned to live in Durham, North Carolina, where he was employed as a truck driver and in warehouse shipping and receiving. His duties included delivering equipment, office furniture, trailers and bagels. Plaintiff also worked as an auto mechanic.
2. Defendant-employer hired plaintiff in March 2001 as a warehouse and plant worker. His duties included handling chemicals, moving tanks and drums, and mixing and disposing of chemicals. He also worked in shipping and receiving.
3. Plaintiff injured his back at work in May 2001. On the advice of his supervisor, plaintiff went home for three days until the pain went away. He then returned to work.
4. Plaintiff injured his back again on 6 June 2001. Plaintiff testified that he moved a fifty-gallon drum of resin on a dolly from the warehouse to the loading dock and that he first felt pain in his back when he made a turn. He further testified that after he reached the loading dock, he immediately felt pain in his lower back radiating down his legs when he attempted to stand the drum upright. Plaintiff believed he had pulled a muscle. He finished his shift and went home. Plaintiff's testimony on how his injury occurred was substantially similar to his recorded statement taken by Brant Merrill, a senior claims specialist with defendant-carrier and is found to be credible. Plaintiff also gave a history of injuring his back at work three days earlier when he sought treatment at Lincoln Medical Center on 8 June 2001. Plaintiff reported that the pain was in his lower back and radiated down his left leg.
5. On 7 June 2001, plaintiff was barely able to move. His body was stiff and he was unable to put pressure on his legs. Plaintiff called in to defendant-employer and described his injury. He told the receptionist that he would try to go see a doctor, but he remained in bed all day. On 8 June 2001, plaintiff again called in and reported he was unable to work and that he was going to Lincoln Community Health Center. The medical providers at Lincoln prescribed pain medication, recommended physical therapy and excused plaintiff from work from 8 June 2001 through 13 June 2001. Plaintiff returned to Lincoln on 14 June 2001 because he was still experiencing pain. He informed defendant-employer of his doctor's visit and was advised to keep them informed. Dr. Scheurer at Lincoln ordered x-rays of plaintiff's spine and left hip. The x-rays indicated possible early degenerative disc disease, but were otherwise negative.
6. Plaintiff continued to receive treatment, including physical therapy, at Lincoln on a regular basis. Defendants paid for plaintiff's medical treatment at Lincoln from June to September 2001. Plaintiff was released on 27 September 2001 and instructed to continue an exercise program on his own.
7. Plaintiff applied for unemployment benefits in late October 2001 and received benefits for thirteen weeks.
8. Defendant-carrier hired Intercare to assist plaintiff with his medical treatment. Donna Roler, a nurse from Intercare, was assigned to plaintiff's case. Plaintiff was restricted to light-duty work.
9. Mr. Allen, plaintiff's supervisor, testified that plaintiff called in after his injury and talked to other employees, but refused to talk to him. Mr. Allen also testified, however, that plaintiff called him on the third day after his injury, stating that he wanted to return to work. Mr. Allen told plaintiff to take a week off to get himself together and plaintiff stated that he needed work and wanted to come back to work.
10. Mr. Allen testified that plaintiff had difficulty following instructions and that he had specifically told plaintiff not to lift heavy tanks. According to Mr. Allen, plaintiff was not required to lift anything over thirty-five pounds and he was instructed to scoop material out of barrels.
11. Mr. Allen further testified that immediately prior to plaintiff's alleged injury, he rolled two barrels on a truck to the dumpster. He emptied one, showed plaintiff how to scoop and dump the other barrel of carbon into the dumpster and then left. According to Mr. Allen, plaintiff was shown how to scoop out the carbon until the barrel got light enough to lift. Plaintiff was then expected to lift the barrel with assistance from another person. Mr. Allen planned to return in about ten to fifteen minutes to help plaintiff lift the barrel. He did not give plaintiff any instructions about lifting or not lifting the barrel. While Mr. Allen was away from the dumpster, another employee, Arthur Love, heard a booming noise. Mr. Love reported to Mr. Allen that plaintiff had dropped a drum and hurt his back. Mr. Allen went over and asked plaintiff what was he doing. Plaintiff replied that while he was trying to lift a drum, he slipped and the drum slipped out of his hands. Plaintiff said he was fine and continued working.
12. Plaintiff returned to work on 14 June 2001 and was fired. Mr. Allen testified that plaintiff was terminated for failure to follow instructions, sitting down on the job and continuous tardiness. According to the statement attached to defendants' Form 19 (Ex. p. 15), "[plaintiff] was discharged on June 14, 2001 because it was determined that [plaintiff's] absenteeism combined with his reluctance to follow instructions was putting him at risk of injury. He apparently aggravated an old injury two times in six weeks."
13. Plaintiff began working at Duke University as a janitor on 6 February 2002. One of his supervisors was Musa Muhammed, an assistant manager. Mr. Muhammed trained and hired plaintiff under probationary status for 90 days. His housekeeping duties required stripping and waxing floors, shampooing carpets, dusting and cleaning bathrooms. Plaintiff was fired for unsatisfactory attendance. Mr. Muhammed testified that when plaintiff was hired, he did not disclose any information about a back problem. He further testified that one needs to have a good back in order to perform work as a housekeeper at Duke. Mr. Muhammed remembered that plaintiff had mentioned a doctor's appointment for his back. He did not recall anyone at Duke telling plaintiff that he was being discharged because he had a pending workers' compensation claim that involved his back. Mr. Muhammed testified that plaintiff was late for work 13 times between 6 February 2002 and 17 April 2002. Plaintiff also had 4 unexcused absences. Mr. Muhammed opined, however, that plaintiff could not have done his job with a bad back.
14. Dr. Robert Jones, a board-certified orthopedist, first saw plaintiff on 21 February 2002. Plaintiff complained of low back pain and leg pain. Plaintiff reported that he had a work related injury in June 2001. Dr. Jones ordered an MRI, which revealed some degenerative changes and a small left-sided herniated disc. On 18 March 2002, plaintiff was still having back and leg pain and back numbness. He was taking ibuprofen and doing light housecleaning. Dr. Jones referred plaintiff to Dr. William Lestini, an orthopedic surgeon.
15. Dr. Lestini first treated plaintiff on 1 April 2002. At that time plaintiff had been diagnosed with degenerative disc disease at L3 to S1. Dr. Lestini did not know if the degenerative changes were actually causing any pain to plaintiff. After a discogram was completed, Dr. Lestini diagnosed plaintiff with low back syndrome of unknown etiology. Dr. Lestini did not operate because plaintiff did not have a definitive diagnosis. He treated plaintiff on 16 June 2002 for the last time. At his last visit, Dr. Lestini recommended conservative treatment and physical therapy for plaintiff. Plaintiff indicated that he did not feel he could do regular duty. Dr. Lestini found plaintiff to be at maximum medical improvement, assigned him a rating of three percent (3%) to his back and recommended permanent, light-duty restrictions. Dr. Lestini testified that he gave plaintiff the benefit of the doubt when it came to plaintiff's symptoms, although objectively, there was no evidence that plaintiff could not work regular duty. Dr Lestini opined that plaintiff really had no restrictions and that plaintiff was never totally disabled while under his care.
16. Dr. Catherine P. Kamientzsky, a board-certified internist first saw plaintiff on 10 September 2002, when he presented for low back pain, left leg pain and numbness and hand numbness. Plaintiff reported to Dr. Kamientzsky that he had injured his back on the job. At that time, plaintiff was not on any medication. Dr. Kamientzsky prescribed Tegretol for pain relief and encouraged plaintiff to swim, lift light weights and lose weight. Dr. Kamientzsky advised plaintiff to not lift more than 20 pounds. On 26 November 2002, plaintiff returned to see Dr. Kamientzsky and complained of back pain and rectal bleeding. Dr. Kamientzsky's diagnosis was back pain with possible radiculopathy or nerve pain. She did not see plaintiff again for treatment. Dr. Kamientzsky opined that it was possible that plaintiff's symptoms were caused by his June 2001 injury; however, she really did not know.
17. Based on the greater weight of the evidence, plaintiff sustained a back injury on 6 June 2001 as a result of lifting a drum at work. Plaintiff's injury arose out of and in the course of his employment and was a direct result of a specific traumatic incident of the work assigned. When the injury occurred, plaintiff was not disobeying a direct order of a then present supervisor. Mr. Allen acknowledged that plaintiff reported to defendant-employer the next day that he was hurting and Mr. Allen knew by the third day after the injury that plaintiff probably had a pulled muscle, even though he may not have known it could be work related. Mr. Allen and defendant-employer knew by 14 June 2001 that plaintiff was claiming a work related injury or aggravation as noted on the Form 19 statement.
18. As a result of plaintiff's compensable back injury, he was unable to work in his current employment or any other employment from 6 June 2001 through 27 September 2001, when plaintiff was released to continue exercises on his own. There is insufficient evidence from which to find that plaintiff was incapable of working after 27 September 2001.
19. Defendants paid for plaintiff's medical treatment until 27 September 2001.
20. As a result of his injury, plaintiff sustained a three percent (3%) permanent partial impairment to his back.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 6 June 2001, plaintiff was sustained a compensable injury by accident to his back arising out of and in the course of his employment as a direct result of a specific traumatic incident of the work assigned by defendant-employer. N.C. Gen. Stat. §97-2(6).
2. As a result of his back injury, plaintiff was incapable of earning wages in any employment from 7 June 2001 through 27 September 2001. Plaintiff is entitled to temporary total disability compensation in the amount of $230.36 for the time period from 6 June 2001 to 27 September 2001. N.C. Gen. Stat. §§ 97-2(9); 97-29.
3. Defendants are obligated to pay for all of plaintiff's reasonably required medical treatment for so long as such treatment is necessary to effect a cure, provide relief and/or lessen his disability, including the medical treatment provided by the Veterans Administration Hospital, Dr. Robert Jones, Dr. William Lestini and Dr. Catherine Kamientzsky. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based on the foregoing stipulations, findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the rate of $230.36 per week from 7 June 2001 through 27 September 2001, subject to an attorney fee awarded hereafter.
2. Defendants shall pay to plaintiff permanent partial disability compensation for 9 weeks at the rate of $230.36 per week for the three percent (3%) permanent partial impairment rating to his back. This compensation has accrued and shall be paid to plaintiff in a lump sum.
3. Defendants shall pay expenses for plaintiff's reasonably required medical treatment to his back from 8 June 2001 through 26 November 2002.
4. An attorney fee of twenty-five percent (25%) of the compensation awarded plaintiff herein is approved for plaintiff's attorney and shall be deducted from the amount due plaintiff and paid directly to plaintiff's attorney.
5. Defendants shall pay the costs for this action.
This the ___ day of August 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER